**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT D. MALINOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-115 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District Judge.

## I.   INTRODUCTION

Robert D. Malinowski ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq*.  Plaintiff filed his applications on January 12, 2007, alleging disability since September 24, 2006 due to being a "slow learner" and "neurotic excoriations (sores on arms)" (AR 145-153; 195)[1]  His applications were denied (AR 133-141), and following a hearing held on February 11, 2009 (AR 30-91), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on July 21, 2009 (AR 21-29).

Plaintiff's request for review by the Appeals Council was subsequently denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, the Plaintiff's motion will be denied and the Commissioner's motion will be granted.

---

[1] References to the administrative record [ECF No. 4], will be designated by the citation "(AR ___)".

1

## II.     BACKGROUND

Plaintiff was 27 years old on the date of the ALJ's decision, and has a high school education (AR 28).  He was previously employed as a maintenance worker, dishwasher and convenience store clerk (AR 196).

*Medical History*

Plaintiff was treated by David Dietman, M.D., a dermatologist, for neurotic excoriation[2] of his arms, hands and right leg beginning on June 21, 2005 (AR 400).  Plaintiff saw Dr. Dietman on September 26, 2006, two weeks before his alleged disability onset date, who reported that the skin on his arms and legs was stable, but his right hand itched (AR 406).  He was prescribed lotion and cream and was to return for follow-up in six months (AR 406).

On January 8, 2007, Dr. Dietman completed an Employability Assessment Form for the Department of Public Welfare ("DPW"), and checked a box stating that the Plaintiff was "permanently disabled" due to a primary diagnosis of neurotic excoriations (AR 425).  As a secondary diagnosis, Dr. Dietman wrote: "pt. has IQ 79 – stress of trying to work causes frustration – leads to excoriations" (AR 425).  On June 14, 2007, Dr. Dietman authored a letter stating that he treated Plaintiff for neurotic excoriations affecting his forearms, arms, and dorsal hands, and at times, his legs (AR 474).  He further stated that Plaintiff's condition was chronic but that he responded to medications (AR 474).  On December 10, 2007, Dr. Dietman completed another DPW form stating Plaintiff was "permanently disabled" for the same reasons set forth in the January 2007 form (AR 473).

On March 20, 2007, Steven Reilly, M.A., performed an intellectual evaluation pursuant to a request from the Commissioner (AR 427).  Plaintiff reported that he lived with his brother (AR 427).  He stated he was able to perform domestic chores and manage his own finances (AR 427).  He denied any history of mental health treatment (AR 427).  Plaintiff obtained a verbal IQ score of 88, a performance IQ score of 81, and a full scale IQ score of 84 (AR 427).  Dr. Reilly noted that "little prompting was necessary" during testing, and he considered the results valid

---

[2] "Neurotic excoriation" is defined as "a self-induced skin lesion, inflicted by the fingernails or other physical means."  *Dorland's Illustrated Medical Dictionary* 593 (27th ed. 1988).

(AR 427). Dr. Reilly observed "mild" signs of pace and coordination difficulties during testing, but there were few signs of concentration or distraction difficulties (AR 427). Dr. Reilly found Plaintiff's cognitive abilities fell within the low average range of intellectual ability (AR 427). He concluded that Plaintiff was not limited or only slightly limited in all functional categories, except he was moderately limited in his ability to carry out detailed instructions (AR 428).

On April 2, 2007, Sanford Golin, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and found that Plaintiff had a low average IQ, but concluded that he had only mild limitations in his activities of daily living, social functioning, and in maintaining concentration, persistence or pace (AR 430-442).

On February 4, 2008, Plaintiff underwent a psychiatric evaluation performed by Matthew DeJohn, M.D. at Stairways Behavioral Health (AR 450-453). Plaintiff reported a history of borderline intellectual functioning (AR 450). He also reported a history of skin excoriations (AR 450). Plaintiff's mother reported that Plaintiff had been placed on Ritalin as a child for possible attention deficit hyperactivity disorder, but had not been on it for years (AR 450). Plaintiff indicated that he was asked to leave his restaurant job because he was having trouble focusing on tasks, but had kept his previous job for four and one half years (AR 450-451). He denied having any psychological symptoms, and reported no attention or concentration problems (AR 450). Plaintiff reported that he was living independently with his brother and was looking forward to finding employment (AR 451). Plaintiff stated he was "doing fairly well" and Dr. DeJohn noted that Plaintiff was not interested in medication (AR 451).

Dr. DeJohn found Plaintiff to be pleasant, cooperative and appropriately groomed (AR 452). His thought process was somewhat superficial, but otherwise linear and logical, and his responses were "very relevant" (AR 452). Dr. DeJohn also found that his memory and judgment were intact, and his insight was "fair" (AR 452). He concluded that Plaintiff "appear[ed] to be functioning quite well" and did "not appear significantly impaired in any manner" (AR 452). He noted that Plaintiff's skin excoriations could "theoretically" be stress related, but that Plaintiff was not reporting any stress (AR 452). He observed that Plaintiff's fingernails were "significantly long" and suggested that he cut them (AR 450; 452). Dr. DeJohn diagnosed

3

Plaintiff with a learning disability by history; attention deficit hyperactivity disorder by history; and "borderline intellectual function versus low normal IQ" (AR 452). He was assigned a Global Assessment of Functioning ("GAF") score of 65 (AR 452).[3]

Plaintiff returned for two counseling sessions in February and March 2008 (AR 455-457). At both sessions, he denied any mental health symptoms and was reportedly "good natured for the most part" (AR 455). It was observed that Plaintiff had cut his fingernails and his excoriations had improved (AR 457).

On February 12, 2008, Plaintiff underwent a psychological evaluation performed by Byron Hillin, Ph.D through the Office of Vocational Rehabilitation to be utilized for future vocational planning and adjunct services (AR 460-471). Dr. Hillin reported that Plaintiff was fully cooperative, his answers appeared truthful, and he "gave good effort at psychological testing" (AR 460). Plaintiff reported that the longest he was employed was for almost five years at Gannon University, but he was terminated for allegedly inappropriately touching a girl (AR 461). He indicated that he enjoyed that job and worked approximately twenty to thirty hours per week (AR 462). Plaintiff reported that he lived with his brother, helped with the chores, enjoyed reading and watching television, and was able to ride the bus (AR 462). He saw his parents on a daily basis, and depended upon them for advice, social help and guidance (AR 462).

Dr. Hillin reported that Plaintiff obtained a verbal IQ score of 80, a performance IQ score of 80, and a full scale IQ score of 78 (AR 464). He noted, however, that Plaintiff was familiar with the multiple subtests and his scores may have been artificially inflated due to "test-retest practice effects" (AR 464). Plaintiff had fair attention, concentration, and memory, but his social judgment and reasoning were "low" (AR 464-465). His thoughts were relevant, coherent and

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 61 to 70 may have "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.

4

goal directed (AR 464). Dr. Hillin found Plaintiff was literate, but that he had difficulty with abstract and complex meaning (AR 464). He noted that Plaintiff had an "elevated level of social interaction" during testing and needed redirection (AR 465).

Dr. Hillin found Plaintiff had "symptoms of Asperger's Syndrome", including difficulty reading social cues, developmental coordination difficulties, and compulsive scratching (AR 466). He also found his general intellect to be within the borderline range (AR 466). Plaintiff had mild difficulties with reading and comprehension (AR 466). Dr. Hillin diagnosed him with Asperger's Disorder and Borderline intellect, and assigned him a GAF score of 70 (AR 456). Dr. Hillin found that Plaintiff worked better in an environment where there were multiple workers to help him as needed (AR 466). He recommended continued employment in the food service or cleaning industry, but believed his tolerance for the demands and stress of full time employment would be poor (AR 467).

*Employment history*

Plaintiff was employed as a cleaner by Gannon University for four years until September 24, 2006 (AR 203). Records from the Employment Opportunities Center reveal that Plaintiff worked at a restaurant and convenience store after his alleged disability onset date (AR 312-388). Plaintiff was a cleaner/dishwasher at the Colony Pub and Grille, and an employment specialist assigned to Plaintiff reported that while he had some difficulty with the cleaning aspect of the job, he "remembered the majority of what he was supposed to do" (AR 320; 322; 330). Plaintiff was able to successfully perform the dishwasher duties without assistance, and was able to keep up a "good pace" (AR 320; 322; 326; 330). The Colony Pub ultimately was dissatisfied with Plaintiff's job performance and he was terminated (AR 341). It was recommended that for future placements, Plaintiff would benefit from a less active, less stimulating work environment (AR 317).

Plaintiff also worked at a Country Fair convenience store, and his employment specialist noted that he "moved from task to task without any problems and didn't need help deciding where to go or what to do next" (AR 355). It was also noted that Plaintiff was "get[ting] better each day he worked" (AR 355). He was subsequently terminated, however, due to a problem

with the quality of his work in some areas, for being too talkative, and because a customer complained that Plaintiff made her feel "uncomfortable" (AR 345). Plaintiff's employment specialist recommended classes to improve his "socialization skills" in order to be successful in the work force (AR 343).

*Administrative hearing*

Plaintiff testified that he last worked between August and September of 2008 at the Country Fair but claimed he was terminated due to an inability to keep up with the work (AR 34-35). He also worked at the Colony Pub and Grill for seven months until he was terminated for the same reason (AR 35-36). Plaintiff stated that he lived with his brother two doors down from his parents' house, and that his mother helped him with his mail and laundry (AR 38-40). He indicated that he was able to perform household chores, watch television and he enjoyed reading comic books, but had some difficulty reading and understanding words (AR 37; 40). He was active in the Special Olympics, including bowling and track events (AR 36-37). Plaintiff testified that he liked to work and would be able to perform an assembly line type job if the tasks were easy to perform (AR 37-38).

Andrew Vitale, the employment specialist assigned to Plaintiff, testified that he was employed by the Gertrude Barber Center, an institute dedicated to helping those with special needs (AR 53). Mr. Vitale testified that Plaintiff understood his job duties, but performed them in the wrong order and that he needed constant redirection (AR 48; 58). Plaintiff was also "very sociable" and became easily distracted by coworkers and customers (AR 48). Mr. Vitale also testified that Plaintiff would function best in a work environment where he was in an isolated setting with enough to keep him busy, but not at such a slow pace that he would become bored (AR 52-53).

Plaintiff's father, Andrew Malinowski, testified that Plaintiff had always been in special education classes (AR 64). Mr. Malinowski indicated that Plaintiff would have difficulty focusing on a job with multiple tasks, and had some difficulty with his coordination and memory (AR 64; 68). Mr. Malinowski indicated that Plaintiff socialized very little with others, confining his activities to those associated with Special Olympics and his family (AR 66).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform work at all exertional levels, but was limited to unskilled work without production lines and with minimal contact with the public (AR 70-71; 76-77). The vocational expert testified that such an individual could perform the unskilled positions of a hand packer, laundry folder, assembler and dishwasher (AR 71-72; 78).

Following the hearing, the ALJ issued a written decision finding that the Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Act (AR 21-29). His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-6). He subsequently filed this action.

### III.   STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course

of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV.    DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through March 31, 2009 (AR 23). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is

determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff's borderline intellectual functioning was a severe impairment, but determined at step three that he did not meet a listing (AR 23-25). The ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but needed unskilled work without production lines and minimal contact with the public (AR 25). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 28-29). The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (AR 26). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ conducted the proceedings in a biased manner, in that she "displayed a predetermined belief that [P]laintiff could work and persisted in a line of questions to this effect." Plaintiff's Brief p. 5. Due process requires that social security claimants be afforded a full and fair hearing. *Ventura*, 55 F.3d at 902. Essential to a fair hearing is the right to an unbiased judge who fulfills his or her duty to develop a full and fair record. *Id*. An ALJ is presumed to be unbiased absent a specific showing for cause to disqualify. *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); *Maher v. Astrue*, 2009 WL 3152467 at *4 (W.D.Pa. 2009). The burden to establish a disqualifying interest rests with the party asserting bias. *Schweiker*, 456 U.S. at 196. A party asserting bias must show that the behavior of the ALJ was "so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

Plaintiff takes issue with the ALJ asking him why he believed he could not perform certain tasks, as well as "press[ing] Mr. Vitale on what types of jobs [P]laintiff could perform." Plaintiff's Brief pp. 5-6. However, questions of this nature are entirely appropriate and relevant, since the critical issue is whether a claimant can perform substantial gainful activity. 20 C.F.R.

9

§§ 404.1505(a); 416.905(a).  In this regard, the ALJ is required to assess a claimant's residual functional capacity ("RFC"), which is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Comm'r of Soc. Sec. Admin*. 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a).  The ALJ considers, *inter alia*, the "descriptions of limitations by the claimant and others" in rendering this assessment.  *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001) (citing 20 C.F.R. § 404.1545(a)).

  To the extent Plaintiff is claiming that the manner in which the ALJ conducted the administrative hearing was biased, we reject this contention.  Plaintiff cites to *Ventura* in support of his request for a remand for a new hearing before a different ALJ.  Plaintiff's Brief p. 6.  In *Ventura*, the court found that the ALJ's questioning of the claimant was coercive and intimidating.  *Ventura*, 55 F.3d at 903-04.  The court further pointed to specific instances where the ALJ repeatedly interfered with the admission of evidence, and blatantly intimidated the claimant's representative.  *Id*.  In reviewing the transcript in light of *Ventura*, it is clear that Plaintiff's claims of bias are not substantiated by the record.

  Plaintiff further argues that the ALJ was biased because "without notice and an opportunity to be heard, [she] accepted the findings and conclusions of an unfavorable decision rendered on February 8, 2006 … ."  *Id*.  Although Plaintiff does not expand upon this argument, the administrative record reflects that Plaintiff's counsel herself forwarded the ALJ a copy of the previous decision (AR 111).  In so doing, she advised the ALJ: "While I did not represent [Plaintiff] before Judge Pileggi, I believe Judge Pileggi's decision was and is flawed.  As [Plaintiff's] impairments are life-long, I believe Judge Pileggi should have granted benefits."  (AR 111).  His contention as to bias and lack of notice are meritless.

  Plaintiff next argues that the ALJ "failed to consider" the vocational expert's testimony that there was a pace component to all jobs (AR 82-83).  Plaintiff's Brief p. 7.  "Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(3).  Plaintiff appears to suggest that substantial

10

evidence supports his contention that he is precluded from working by virtue of an inability to work at an adequate pace. We disagree.

The medical evidence does not reveal such an extreme limitation in this functional area. Dr. Reilly found only "mild" signs of pace and coordination difficulties during testing, with few signs of concentration or distraction difficulties (AR 427). Dr. DeJohn, Plaintiff's treating psychologist, found that Plaintiff was functioning "quite well" and did not appear significantly impaired in any manner (AR 452). Dr. Golin, the state agency reviewing physician, concluded that Plaintiff had only mild limitations with respect to concentration, persistence or pace (AR 440). Dr. Hillin, the consulting psychologist, found that Plaintiff worked better in an environment where there were multiple workers to help him as needed, and recommended that he work in the food service or cleaning industry (AR 466-67).

Moreover, Plaintiff's employment history also does not support the conclusion that he was unable to complete tasks due to difficulties with pace. Plaintiff was able to work for four years as a cleaner at Gannon University, and reportedly wanted to work full-time at that job (AR 195). While employed as a dishwasher at a restaurant, Plaintiff was able to remember the majority of his duties, and was able to keep up a "good pace" (AR 320; 322; 326; 330). Although Plaintiff had difficulty with the cleaning aspect of the job because he talked to his job coach, it was noted that he "had no trouble with the other areas of his work" (AR 328). During his employment at the convenience store, Plaintiff's employment specialist reported that he "moved from task to task without any problems, and didn't need help deciding where to go or what to do next" (AR 355). Plaintiff's performance improved "each day he worked" and he was able to complete tasks with "very little prompting" (AR 355; 370).

While Plaintiff may have had some difficulty performing multiple tasks and would become socially distracted, the ALJ accommodated any deficiencies in these areas by limiting him to unskilled jobs involving no more than one or two step instructions, not involving a production like pace, and involving only minimal contact with the public (AR 25, 70). The vocational expert testified that he could work as a dishwasher, assembler and laundry folder, notwithstanding these limitations (AR 28-29; 79). Mr. Vitale opined that Plaintiff was not

precluded from working (AR 52-53). He felt Plaintiff would function best in an isolated setting (AR 52-53).

In sum, we find substantial evidence supports the ALJ's conclusion with respect to the Plaintiff's functional abilities relative to concentration, persistence and pace.

Plaintiff next argues that the ALJ's hypothetical propounded to the vocational expert was insufficient because it did not contain all of his impairments. Objections to the adequacy of the hypothetical questions posed to the vocational expert "often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir.2005). RFC assessments and hypothetical questions must be a reflection of all of a claimant's credibly established impairments. *Id*. at 554 ("the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations."). The ALJ is not, however, required to submit to the vocational expert every impairment alleged by the claimant. *Id*. "Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but 'cannot reject evidence for no reason or for the wrong reason[.]'" *Id*. (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993).

Plaintiff argues that the ALJ's hypothetical failed to account for his symptoms associated with his Asperger's Disorder, Attention Deficit Hyperactivity Disorder, and Skin Excoriations. Plaintiff's Brief p. 8. Specifically, Plaintiff claims that the ALJ did not account for his difficulty in "reading social cues," his compulsive need to scratch, and his claimed inability to focus, remember and remain on task. *Id*. A review of the record, however, reveals that the ALJ did include limitations in her hypothetical question that encompassed some of the Plaintiff's claimed limitations. For example, while the ALJ did not phrase the hypothetical in the fashion he suggests, her hypothetical did limit Plaintiff to unskilled work, which accommodated his alleged difficulties with regard to concentration, persistence and pace (AR 70, 76).[4] *See e.g.*, *McDonald v. Astrue*, 293 Fed. Appx. 941, 946-47 (3d Cir. 2008) (ALJ accounted for moderate limitations in

---

[4] "Unskilled work" is defined in the regulations as work "which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568; 416.968.

concentration, persistence and pace in hypothetical by restricting the claimant to simple, routine tasks);[5] *Douglas v. Astrue*, 2011 WL 482501 at *5 (E.D.Pa. 2011) ("The ALJ's hypothetical limiting [claimant] to unskilled work adequately accounted for his moderate limitations in concentration, persistence and pace."). Accordingly, the ALJ's hypothetical "accurately conveyed" Plaintiff's limitations in this area.

We reject Plaintiff's contention that his alleged difficulty in reading social cues precluded him from working and therefore, this limitation should have been included in the hypothetical question posed to the expert. The ALJ found no evidence of such severe problems with social functioning that would preclude Plaintiff from working (AR 25), and Plaintiff has failed to point to any evidence supporting this contention. Plaintiff's evidence demonstrates that he was socially distracted and/or inappropriately interacted with customers (AR 345; 465). The ALJ's hypothetical restricted Plaintiff to work involving minimal contact with the public in order to account for these difficulties (AR 70; 76).

With respect to Plaintiff's skin excoriations, the ALJ did not err in failing to include any limitations related to this condition in her hypothetical. The ALJ observed that Plaintiff's skin excoriations had not prevented him from performing his past work (AR 27). She further noted that his last treatment for this condition was in February 2007, and treatment records reflected that his condition was stable and he was treated with a prescribed cream (AR 27). Finally, she noted that Plaintiff was only on a six month follow up schedule for treatment (AR 27). She concluded that Plaintiff's skin condition did not impose any significant functional limitations (AR 27). All of the ALJ's findings are supported by substantial evidence in the record.

## V. CONCLUSION

For the reasons discussed above, the Plaintiff's motion will be denied and the Commissioner's motion will be granted. An appropriate Order follows.

---

[5] Unskilled work is consistent with simple, routine tasks. *Bovell v. Barnhart*, 2006 WL 1620178 at *3 (E.D.Pa. 2006).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT D. MALINOWSKI, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 11-115 Erie |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

AND NOW, this 26th day of July, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 10] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Robert D. Malinowski.

The clerk is directed to mark the case closed.

              s/ Sean J. McLaughlin
               United States District Judge

cm:  All parties of record